UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| EULA MAE EDWARDS, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 3:12-CV-1649-B |
| | § | |
| CAROLYN W. COLVIN, *Commissioner* | § | |
| *of Social Security,* | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court are Plaintiff Eula Mae Edwards' Motion for Summary Judgment (doc. 15), filed on September 19, 2012, and Defendant Carolyn W. Colvin's cross-Motion for Summary Judgment (doc. 16), filed on October 19, 2012. Based on the relevant filings, evidence, and applicable law, Plaintiff's Motion is **DENIED**, Defendant's Motion is **GRANTED**, and the Commissioner's decision is **AFFIRMED**.

## I.

## BACKGROUND[1]

A.    *Procedural History*

Plaintiff Eula Mae Edwards seeks judicial review of a final decision by the Commissioner of Social Security denying her claims for disability insurance benefits and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. Doc. 15-1, Br. at 2. Plaintiff applied for

---

[1]The background information comes from the record of the administrative proceedings, which is designated as "R."

disability insurance benefits and SSI in April 2008, alleging disability beginning April 3, 2007, due to issues with her knees, heart, eyes, shoulders, back, and hands, as well as diabetes. R. at 67, 81. Her claims were denied initially and upon reconsideration. Doc. 15-1, Br. at 2. She timely requested a hearing before an Administrative Law Judge ("ALJ"). *Id.* She personally appeared and testified at a hearing on September 3, 2009. R. at 56. On December 3, 2010, the ALJ issued a decision finding Plaintiff not disabled. R. at 36-47. Following the ALJ's decision, Plaintiff submitted a brief and new evidence to the Appeals Council. R. at 35. The Appeals Council admitted the new evidence but denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. R. at 1-6. She timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g).

B.      *Factual History*

      1.      Age, Education, and Work Experience

Plaintiff was born on November 12, 1949 and was 59 years old at the time of her administrative hearing. R. at 60. She graduated from high school and has past relevant work as a unit secretary in a hospital, a retail sales assistant, and a retail shipper. R. at 61-64.

      2.      Medical Evidence

The following includes a summary of the medical evidence relevant to this appeal.  In 1994, Plaintiff was diagnosed by Dr. William Geissler with carpal tunnel syndrome and right trigger thumb and underwent corrective surgery. R. at 736. Plaintiff followed up after surgery and had no complaints. R. at 735. Two years later, in October 1996, Plaintiff saw Dr. Geissler for recurring pain in her right hand and right thumb as well as her neck. R. at 734. Dr. Geissler opined that Plaintiff suffered from a Heberden's node in her thumb and mild cervical spine spondylosis. R. at 734. He

prescribed anti-inflammatories as needed. R. at 734. Plaintiff went to outpatient rehabilitation services for pain in her hands almost a decade later, in June 2003. R. at 743-46. At the time, she also alleged numbness and swelling. R. at 743-46.

In December 2006, Plaintiff had an MRI taken of her right knee, indicating small joint effusion, no meniscal tear, intact anterior and posterior ligaments, and a small subchondral cyst in the lateral tibial plateau. R. at 459. An x-ray showed mild changes of osteoarthirits but no other acute abnormality. R. at 460. Plaintiff then saw Dr. Gary McCarthy for knee pain, who determined that Plaintiff suffered from slight medial osteoarthritis. R. at 471. In January 2007, Dr. McCarthy evaluated Plaintiff for knee pain, noted palpation, crepitus, and swelling, and gave Plaintiff Hyalgan injections. R. at 456, 465, 467, 469. Dr. McCarthy found that Plaintiffs knee was doing better after the injections. R. at 456. Plaintiff was also found to have some slight scoliosis as well as narrowing and sclerosis in her lower spine. R. at 457.

In April and May 2007, Plaintiff described back, foot, shoulder, and chest pain to her OB-GYN. R. at 401-03. Dr. Melvin Merritt reviewed Plaintiff prior to a hysterectomy and found normal extremities and heart. R. at 416. Around that time, Plaintiff also had a study of her lower back, and Dr. Marvin McCay found some degenerative disease and a "tiny disc protrusion" but otherwise concluded that his review was unremarkable. R. at 388. In September 2007, Plaintiff went to the hospital for gall stones and noted her shoulder and back pain, but denied arm or leg pain. R. at 496.

In her Disability Report of April 2008, Plaintiff indicated that the conditions limiting her ability to work included a protruding disc and pain in her hands. R. at 181. She alleged that these conditions first interfered with her ability to work in April 2007. R. at 181. Plaintiff's Daily Activity Questionnaire indicated problems with her feet, hands, back, left shoulder, and stomach. R. at 188,

190. On her Pain Report, she indicated problems with her left shoulder, hands, back, knee, right foot, chest, and wrist. R. at 200. She stated that her feet burn, her hands swell and ache, her back aches, she has shooting pain in her right shoulder, her head throbs, and her knees ache. R. at 202, 204. In her Disability Report-Appeal form, Plaintiff stated that new conditions include painful hips, blurry vision, and high blood pressure. R. at 211.

Plaintiff was seen by Dr. Eidi Millington for a consultative examination in May 2008. R. at 437. Plaintiff complained of back, hand, knee, ankle, chest, abdominal, and head pain. R. at 437. She reported taking Lotrel, ibuprofen, Flexeril, Elavil, Ativan, and Tylenol extra strength. R. at 439. Dr. Millington concluded that Plaintiff's back pain could be due to a 1996 work-related injury as well as obesity; the hand pain may in part be due to overuse, carpal tunnel syndrome, or early rheumatic disease; and the knee pain could be due to osteoarthritis and "a bit of crepitation" on the left knee. R. at 440-41. Plaintiff underwent a second consultative examination in October 2008 by Dr. Jack Brooks. R. at 472. Plaintiff complained of hand pain and noted back soreness. R. at 473. Dr. Brooks' evaluation yielded findings of normal heart, good back muscle strength, normal but somewhat limited range of motion in the back without tenderness, good motor and grip abilities in the extremities, full range of motion in the shoulders with some right shoulder limitations, good upper extremity muscle strength, good strength and range of motion in the hands, and full range of motion of the hips, knees, and ankles. R at 475-76. Dr. Brooks described Plaintiff as having a history of chronic low-back pain and a history of chronic bilateral hand pain. R. at 476.

In June 2008, Dr. Ingrid Zasterova completed an x-ray on Plaintiff's back and concluded that her spine was normal. R. at 444. Dr. Zasterova also found that Plaintiff's hands were normal other than some hyperextension in several fingers. R. at 445. Months later, Dr. Thomas Cornell evaluated

Plaintiff for back pain and determined that she had mild diffuse spondylitic spurring indicating degenerative change. R. at 483, 486.

A month later, Plaintiff had elevated blood glucose. R. at 708. She reported arthritis and back pain R. at 708. She was examined and found to have normal back and extremities. R. at 709.

In her Disability Report-Appeal form of February 2009 , Plaintiff indicated that her back pain had worsened and that she had new pain in her shoulders and hands. R. at 236. She also complained of foot, knee, and leg problems, hypertension, headaches, and dizziness. R. at 239.

In May 2009, Dr. Michael Vaughan diagnosed Plaintiff with supraventricular tachycardia and palpitations of the heart. R. at 623, 625. Plaintiff had ablation surgery to correct the problem. Dr. Vaughan saw Plaintiff again in June and confirmed a paroxysmal supraventricular tachycardia with a successful lab ablation. R. at 644. Plaintiff followed up with Dr. Charles Lampe, who opined that Plaintiff's ablation surgery for tachycardia was successful, that he probably would not need to see her again, and that she could follow up with him or Dr. Vaughan for future issues, and that Plaintiff could return to driving. R. at 653. From 2009 through 2011, Plaintiff followed up with Dr. Vaughan several times for chest pain, and he essentially diagnosed her with "chest pain" and noted her heart history with no new problems. R. at 805, 809-13, 833.

In June 2009, Plaintiff saw Dr. Nancy Georgekutty, who examined Plaintiff's right shoulder. R. at 650. Dr. Georgekutty found no fracture or dislocation, but mild joint arthropathy and a subacromial spur. R. at 650. Dr. Georgekutty had previously found degenerative disease and some grade I slippage. R. at 732.

In September 2009, Plaintiff saw Dr. Scott Stoll for pain in her hands, arms, and legs. R. at 758. Dr. Stoll concluded after testing that the symptoms and testing were consistent with a diagnosis

of mild to moderately severe peripheral polyneuropathy, mild bilateral carpal tunnel syndrome, and mild to moderately severe bilateral Tardy Ulnar Palsy. R. at 769-70. In the same month, Plaintiff saw Dr. Maurice McShan, who completed a Residual Functional Capacity Questionnaire. R. at 771. Dr. McShan opined that Plaintiff had back pain, hypertension, and arthritis and concluded that she was incapable of working. R. at 772. That same month, electrodiagnositic testing of the arms and legs indicated normal limits for most tested nerves, but mild to moderately severe peripheral polyneuropathy and carpal tunnel syndrome at the wrists. R. at 769.

In February 2011, Plaintiff saw Dr. Brent Shepherd for hip pain. R. at 299. Dr. Shepherd assessed her with trochanteric bursitis (hip) and noted a 5/5 strength in her bilateral lower extremities. R. at 299. In April 2011, Plaintiff saw Dr. John Zarosky to follow up with her hip problems. R. at 298. She also complained of right shoulder pain. Dr. Zarosky assessed her with bilateral greater trochanteric bursitis (hip), "right shoulder pain per history," and diabetic neuropathy. R. at 298. He noted a 5/5 strength in her bilateral lower extremities. R. at 298.

The following month, Dr. Arthur Pawgan saw Plaintiff for right shoulder pain and concluded that there was no evidence of fracture, displacement, or tissue damage but that there were degenerative changes evident. R. at 331-32. He had previously opined that Plaintiff had degenerative disease and some grade I slippage in her spine. R. at 663.

3.    Hearing Testimony

On September 3, 2009, the ALJ held a hearing on Plaintiff's claim for disability insurance benefits and SSI. R. at 56. Plaintiff and a vocational expert testified at the hearing. *Id.* Plaintiff was represented by an attorney. *Id.*

a.    *Plaintiff's Testimony*

Plaintiff testified that she was 59 years old at the time of the hearing and is a high school graduate. R. at 60. She is divorced and lives with her adult daughter and two grandchildren. R. at 79. Plaintiff explained that, at home, she does the laundry, straightens up her room, gets the mail, goes to church, reads books, and watches television. R. at 79-80.

Plaintiff also testified to her work history. She stated that she was a unit secretary in a hospital, which involved running errands, getting supplies, and typing orders into the computer. R. at 61-62. Prior to that, she worked at Wal-Mart and K-Mart as a retail sales assistant, at Wackenhut performing security, and at TJ Maxx in shipping and receiving, which involved opening boxes and putting freight on the floor. R. at 63-64.

The ALJ asked Plaintiff to describe all of her medical problems. Throughout the hearing, Plaintiff mentioned problems with her knee, heart, eye, hands, shoulder, and back as well as diabetes. R. at 67, 81.

With respect to Plaintiff's heart problems, Plaintiff mentioned that she started having tachycardias in 2001. R. at 67-68. She testified that she was able to work with the condition in the past, and agreed that the problem was continuing at the same level through the years. R. at 68. At the time of the hearing, she was on medication for the condition, but continued to have heart flutters that last about an hour every other day. R. at 68-69. She stated that the medication was not controlling the problem. R. at 68. She also stated that when her heart flutters, she tries to sit and calm down. At one point, Plaintiff wore a heart monitor and her physicians found a hole in her heart. R. at 70. On May 19, 2009, she underwent a procedure known as an ablation, which her physician

felt had helped the problem. R. at 70. Plaintiff, however, states that the problem is not completely taken care of.

In terms of her knee problems, Plaintiff stated that she has "bone crunching" and that her knee "gives away" when she tries to walk. R. at 72. Plaintiff testified that she has fallen and had severe pain arising from her knee. R. at 72. She had knee injections in January 2007, which she claims did not help. R. at 73. At the time of the hearing, Plaintiff took Flexeril three times a day, Hydrocodone two times a day, and Meloxicam two times per day for pain. R. at 73. Plaintiff stated that she has difficulty walking and standing. R. at 74. She had an appointment with an orthopedic doctor for her knee, which was scheduled after the hearing. R. at 74.

Next, Plaintiff discussed her eye problems. She explained that there appears to be a film that covers her left eye and that doctors have considered that she might have glaucoma. R. at 75. The ALJ asked Plaintiff whether her vision problems were tied to her diabetes. R. at 75. Plaintiff believed it was, but stated that her doctors were not sure. R. at 75. She admitted, however, that her vision was fine when she wore her glasses. R. at 76.

The ALJ next turned to Plaintiff's diabetes. Plaintiff testified that she has been taking 500 milligram Metformin since December 12, 2008. R. at 76. She also takes Glipizide when her blood sugar levels reach a certain point. R. at 76. She stated that since she has had diabetes, she has had sore legs and feet and her hands have swollen. R. at 77.

The testimony then turned to Plaintiff's shoulder problems. Plaintiff had surgery on her right shoulder in 1996 or 1997, but claimed that her shoulder is still bothering her. R. at 77-78. She described "bone crunching" and "cracking" and stated that she could not lift her arms up too high.

Lastly, Plaintiff discussed her hand problems. She described swelling and a difficulty opening and handling things. R. at 78. She explained that she had carpal tunnel, which created tingling, numbness, and swelling. R. at 78. Plaintiff had surgery on her hands in 1986.[2] She had a nerve conduction study scheduled after the hearing. R. at 83.

Plaintiff's attorney also questioned Plaintiff. He asked why she had ceased working in April 2007. Plaintiff explained that she had a fibroid tumor that was pressuring a nerve in her back. R. at 81. She had the tumor removed but still has back problems. She saw Dr. McShan, who took her off of work for four months and then encouraged her to file for disability. R. at 81. Hearing about the back problems for the first time, the ALJ then questioned Plaintiff about the extent of her problems. R. at 81. Plaintiff responded that she had a protruding disk. R. at 82. She explained that she cannot get up from a sitting position due to the combination of her back and knee problems. R. at 82.

Plaintiff also testified that she cannot lift five or ten pounds or even a jug of milk. R. 82. She does not use a computer or keyboard because her fingers hurt due to sticking them to monitor her blood sugar for her diabetes. R. at 82.

       *b.*     *Vocational Expert's Testimony*

A vocational expert (VE), Karyl Kuuttila, also testified at the hearing. R. at 65-66. She testified that Plaintiff's past relevant work included her jobs as a unit secretary (light, semiskilled, SVP-3) and a retail sales clerk fast food worker (light, semiskilled, SVP-3). R. at 66.

The ALJ asked whether these positions have any transferable skills to sedentary work, and the VE explained that they would. R. at 66. The ALJ asked what sort of jobs Plaintiff could perform

---

[2]The record reflects hand surgery in 1994. R. at 736.

at the sedentary level with these transferable skills, and the VE explained that applicable jobs included a clerical sorter (i.e., a sedentary file clerk). R. at 83. The VE stated that there were 6,500 sorting positions in Texas and 707,000 nationwide. R. at 86. Applicable jobs also include telephone solicitor, for which there were 13,000 positions in Texas and one million nationwide, and medical voucher clerk, for which there were 2,000 positions in Texas and 322,000 positions nationwide. R. at 86. The ALJ then asked whether an individual who was unable to frequently handle things would be precluded from these positions, and the VE agreed that an inability to more than occasionally handle things would eliminate vocational transferability. R. at 87.

C.      *ALJ's Findings*

The ALJ denied Plaintiff's application for benefits by written opinion issued on December 3, 2010. R. at 36-52. At step one, the ALJ found that Plaintiff was fully insured for disability through December 31, 2012, and had not engaged in substantial gainful activity since April 3, 2007. R. at 41.

At step two, the ALJ found that Plaintiff had the following severe impairments: obesity, diabetes, history of tachycardia, and back pain. R. at 41. The ALJ explained that she considered the impairments under *Stone v. Heckler*, 752 F.2d 1099 (5th Cir. 1985). The ALJ explicitly stated that Plaintiff's vision problem was not a severe impairment because Plaintiff had adequate vision with her glasses and failed to describe vision as an impairment to the consultative physicians. R. at 41. The ALJ did not mention Plaintiff's other alleged impairments at this step.

At step three, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. R. at 42.

-10-

At step four, the ALJ determined that Plaintiff had the residual functional capacity to perform a full range of light work. R. at 42. The ALJ explained that she considered all of the symptoms that were reasonably consistent with the objective medical evidence and considered opinion evidence. R. at 42. In reviewing the alleged symptoms, the ALJ followed a two-step process, first deciding that there were underlying medically determinable physical impairments that could reasonably be expected to produce the claimant's pain and symptoms but, second, that Plaintiff's alleged intensity, persistence, and limiting effects of the pain and symptoms were not credible. R. at 42.

Continuing at step four, based on the VE's testimony, the ALJ found that Plaintiff was capable of performing her past relevant work as a secretary or as a floor attendant, which involved light work. R. at 46. The ALJ noted that as a retail assistant, Plaintiff mostly stood and walked during the day and did not lift more than ten pounds. R. at 47. Further, as a secretary, Plaintiff alternated between sitting, standing, and walking, and lifted between ten to twenty pounds. R. at 47. The ALJ found that Plaintiff was capable of performing work of light exertion, that she could sit, stand, or walk during an eight-hour work day, and could lift 10 to 20 pounds at varying frequencies.

Because the ALJ found that Plaintiff was capable of performing her past relevant work, the ALJ did not consider at step five whether there were other jobs in the national economy that Plaintiff could perform. R. at 47.

## II.

## LEGAL STANDARDS

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied

proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g). Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence supports the Commissioner's decision. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 n.1 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id*. The Court may rely on decisions in both areas, without distinction, when reviewing an ALJ's decision. *See id*.

## III.

## ANALYSIS

To be entitled to social security benefits, a claimant must prove he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (per curiam) (summarizing prior rule under 20 C.F.R. § 404.1520(b)-(f), currently at 20 C.F.R. § 404.1520(a)(4)(i)-(v)). Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id*. Once the claimant satisfies his or her burden under the first four steps, the burden shifts to the Commissioner at step five to show there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational

Guidelines of the regulations, by vocational expert testimony, or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

> Plaintiff presents the following issues for review:
>
> A.     The ALJ's step two findings must be supported by substantial evidence. Here, medical records and testimony establish the existence of impairments which affected Edwards's ability to work but which were not found severe. Does the ALJ's step two error require remand of Edwards's case back to the Administration?
>
> B.     The ALJ's RFC finding must include both exertional and nonexertional limitations supported by the record. The ALJ's RFC finding failed to incorporate any postural or manipulative limitations despite Edwards's medically determinable upper and lower extremity and hand impairments. Does the ALJ's unsupported RFC finding require remand?

Doc. 15-1, Mot. at 1. The Court analyzes each of these issues, below.

A.     *Step Two Error: Existence of Additional Severe Impairments*

Plaintiff's first issue of error involves the ALJ's findings at step two. The ALJ found that Edwards' obesity, diabetes, tachycardia, and back pain were severe impairments. R. at 41. The ALJ also explicitly found that Edwards' vision problems did not constitute a severe impairment. R. at 41. Edwards alleges that the ALJ erred in not even mentioning her other impairments–hand, knee, and shoulder problems–which Edwards contends are severe impairments. The Commissioner responds that the ALJ actually did consider all of these impairments but simply did not find them to be severe.

Pursuant to the Commissioner's regulations, a severe impairment is "any impairment or combination of impairments which significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c), 416.920(c). Finding that a literal application of this

regulation would be inconsistent with the Social Security Act, the Fifth Circuit has held that an impairment is not severe "only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work." *Stone v. Heckler*, 752 F.2d 1099, 1101, 1104-05 (5th Cir. 1985) (internal quotation marks and alterations omitted); *Brunson v. Astrue*, 387 F. App'x 459, 461 (5th Cir. 2010) ("An impairment is severe if it significantly limits an individual's physical or mental abilities to do basic work activities; it is not severe if it is a slight abnormality or combination of slight abnormalities that has no more than a minimal effect on the claimant's ability to do basic work activities."). Additionally, the determination of severity may not be "made without regard to the individual's ability to perform substantial gainful activity." *Stone*, 752 F.2d at 1104. Plaintiff agrees that the ALJ cited to the proper standard under *Stone* in considering the severity of her impairments.

The ALJ's discussion at step two was admittedly brief. R. at 41. The ALJ noted the *Stone* standard and listed Plaintiff's severe impairments of obesity, diabetes, history of tachycardia, and back pain. *Id.*; 20 C.F.R. §§ 404.1520(c), 416.920(c). No explanation accompanied the ALJ's reasons for finding these impairments to be severe, and neither Plaintiff nor the Commissioner disputes the ALJ's findings as to those limitations. R. at 41. Next, the ALJ noted that Plaintiff testified as to vision problems but admitted that her vision was adequate with her glasses. R. at 41. The ALJ noted that Plaintiff failed to list her vision as an illness, condition, or injury to the consultative physicians and that the consultative physicians noted that Plaintiff's vision was normal. R. at 41. As such, the ALJ found that the alleged vision impairment was not severe. The parties also do not dispute this finding.

The ALJ's analysis at step two ended at this point, and the ALJ did not mention Plaintiff's alleged hand, shoulder, or knee problems in the analysis. R. at 41. However, the ALJ explicitly

mentioned Plaintiff's hand, shoulder, and knee problems in its analysis at step four, which demonstrates that the ALJ was aware of Plaintiff's allegations as to these medical impairments. *See* R. at 42.

Although Plaintiff complains that the ALJ failed to mention these additional impairments, Plaintiff does not raise any authority indicating that the ALJ's failure to *mention* an alleged impairment in its findings at step two necessitates remand. Plaintiff does, however, argue that the ALJ should have found her hand, shoulder, and knee impairments severe. In support of her argument, Plaintiff points to evidence in the record related to these problems. Doc. 15-1, Br. at 10-11. She has been diagnosed with mild to moderately severe peripheral polyneuropathy, carpal tunnel syndrome, mild degenerative joint disease, and mild to moderately severe bilateral Tardy Ulnar Palsy. Doc. 15-1, at 10 (citing R. at 441, 445, 476, 733, 769, 770, 771). In 2008, Dr. Millington opined that Plaintiff's hand pain may in part be due to overuse, carpal tunnel syndrome, or early rheumatic disease. R. at 441. Dr. Zasterova noted hyper-extension in three of Plaintiff's fingers. R. at 445. In 2006, Dr. Wells and Dr. Dyess determined that a small joint effusion was present in Plaintiff's right knee with a small subchondral cyst and osteoarthritis. R. at 459-61. In 2006, Dr. McCarthy noted a good range of motion and some slight palpable osteophytes in the knee. R. at 471. In 2007, Dr. McCarthy noted a limited range of motion, crepitus, and swelling in the knee. R. at 465, 467, 471. In 2008, Dr. Millington noted that Plaintiff's knee pain could be due to osteoarthritis and crepitation, the later of which could be due in part to Plaintiff's weight. R. at 441. Finally, Plaintiff notes that as early as 2003, she complained of hand pain, R. at 744-756, and complained of it again in 2008. R. at 437-48. She also points to her hearing testimony describing her pain. R. at 73-74, 78, 82.

In response and in support of its own request for summary judgment, the Commissioner argues that, although there is some evidence to support the existence of impairments, substantial evidence supports the ALJ's finding at step two that Plaintiff's hand, shoulder, and knee impairments were not "severe." Doc. 16, Mot. at 4. Specifically, the Commissioner points out that Plaintiff did not and has not presented objective medical evidence of these severe impairments. For example, the Commissioner points to Dr. Millington's 2008 consultative examination, which indicated a 5/5 strength in upper and lower extremity large muscle groups and a grip strength of 4/5. R. at 440. Dr. Zasterova's 2008 x-ray report of Plaintiff's left hand indicated hyperextension but an "otherwise normal hand." R. at 445. Dr. Hood's 2008 consultative examination yielded a report of no muscle atrophy or hyperesthesia, a 5/5 motor examination, full range of motion in the shoulders with some limitation to the right shoulder, and intact rotator cuffs, ultimately concluding that "[e]xamination of the hands shows good strength and range of motion." R. at 475. Dr. Hood also found that "[t]here is a full range of motion of the . . . knees." R. at 476. A 2009 x-ray of Plaintiff's right shoulder indicated no acute fracture or displacement and normal soft tissues, but simply some degenerative changes. R. at 331. A 2009 report from Dr. Stoll indicated a "mild to moderately severe peripheral polyneuropathy in the arms and legs" and "mild bilateral Carpal Tunnel Syndrome." R. at 769. As to Plaintiff's knees, Dr. McCarthy's examination showed that Plaintiff had a good range of motion and "okay" motor and sensory findings and, after two Hyalgan injections, that her knee was doing even better. R. at 471. The Commissioner maintains that this evidence, taken together, provides substantial evidence for the ALJ's implicit finding that Plaintiff's hand, shoulder, and knee impairments were not severe.

In addition, the Commissioner notes that Plaintiff admitted that she was able to work with her carpal tunnel syndrome since 1984 before she stopped working in 2007. Doc. 16, Resp. at 6. The Commissioner also points out that Plaintiff admitted in an examination with Dr. Millington that occupational therapists showed Plaintiff tricks to get around her difficulties with her upper extremities. R. at 438. As to her knee pain, Edwards also admitted in 2008 that she could walk for three-quarters of a mile and walks for exercise. R. at 189, 218, 437.

In her Reply brief, Plaintiff responds by providing evidence specifically related to the alleged severity of her hand, shoulder, and knee impairments. Doc. 17, Reply at 3. She points to evidence in the form of a residual functional capacity questionnaire in which her treating physician, Dr. McShan, placed restrictions on her ability to use her hands. R. at 774. She again points to her hearing testimony as evidence of her inability to use her hands and shoulders. R. at 78, 80, 82.

The Court agrees with the Commissioner that, although Plaintiff presents some evidence of the existence impairments to her hands, shoulders, and knees, there was more than substantial evidence in the record to find that these impairments did not rise to the level of severity under 20 C.F.R. §§ 404.1520(c), 416.920(c). First, Plaintiff had been able to work with her hand, knee, and shoulder problems for many years and she continued to do a number of daily activities which would involve the use of her hands, knees, and shoulders. A claimant's ability to work despite suffering from a pre-existing condition will support an ALJ's finding of not disabled related to that condition. *See Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir. 1995) (citing *Fraga*, 810 F.2d at 1305 & n.11); *Henderson v. Colvin*, No. 12-40578, 2013 U.S. App. LEXIS 5955 (5th Cir. Mar. 25, 2013) ("The ALJ could appropriately use the fact that Henderson continued to perform skilled work as a practical nurse for more than two years after the alleged stroke to substantiate his conclusion that her stroke

-18-

was not a severe impairment."). Further, much of the evidence Plaintiff points to in support of her position involves her own complaints to physicians or her hearing testimony. "[S]ubjective complaints must be corroborated at least in part by objective medical testimony." *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989) (citing *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988)). The two consultative examinations indicated that Plaintiff had good grip strength, good strength in her upper and lower extremities, and a full range of motion in the hands, knees, and shoulders (with some limitation in the right shoulder. R. at 440, 475-76. Her hands were essentially found to be normal. R. at 445. Her shoulder was found to have mere degenerative problems. R. at 331. Substantial evidence therefore showed that her hand, knee, and shoulder impairments would not "significantly limit" her ability to do basic work activities. *Stone*, 752 F.2d at 1101, 1104-05; *Brunson*, 387 F. App'x at 461. The Court does not discern reversible error as to the ALJ's finding at step two.

B.      *Step Four Error: Residual Functional Capacity*

Plaintiff's second issue of error involves the ALJ's findings at step four. The ALJ found that Plaintiff had the RFC to perform a full range of light work. Plaintiff narrowly contends that the ALJ's findings were in error because they did not include a complete consideration of nonexertional limitations related to Plaintiff's hand, shoulder, and knee problems in connection with her other impairments. Doc. 15-1, Br. at 13-16. The Commissioner argues that the ALJ's findings as to Plaintiff's RFC are supported by substantial evidence. Doc. 16, Mot. at 8.

"Residual functional capacity represents an individual's remaining ability to perform particular activities despite the limitations imposed by an individual's impairment." *Villa v. Sullivan*, 895 F.2d 1019, 1023 (5th Cir. 1990). It is the ALJ's responsibility to make the RFC determination. *Id.*; 20 C.F.R. §§ 404.1546, 416.946. The ALJ's RFC decision can be supported by substantial

evidence even if she does not specifically discuss all the evidence that supports her decision or all the evidence that she rejected. *Falco v. Shalala*, 27 F.3d 160, 163-64 (5th Cir. 1994).

In assessing Plaintiff's RFC, the ALJ addressed the relevant legal standards. R. at 42. The ALJ then outlined Plaintiff's testimony at the administrative hearing and the objective medical evidence. R. at 42-44. Among the medical evidence, the ALJ pointed out the following related to Plaintiff's hand, knee, and shoulder problems. In October 2006, Plaintiff reported that her pain was improved by using Motrin and Flexeril on an as-needed basis. R. at 43. In December 2006, Plaintiff was determined to have a good range of knee motion, and in January 2007 she had normal motor and sensory functioning with only mild osteoarthritis. R. at 43. In September 2007 while being treated for an unrelated condition, Plaintiff denied extremity pain and was found to have normal extremities. R. at 43. In December 2008, Plaintiff was seen for an unrelated condition and had normal examinations of her back, extremities, and motor and sensory functioning. R. at 43. At that time she reported taking ibuprofen and Flexeril. She was diagnosed with mild arthropathy and a small spur in her right shoulder. R. at 43. In September 2009, Plaintiff was determined to have normal sensations at her arms, hands, legs, and feet but tingling in the toes of her right foot and pain in her right shoulder. R. at 44. Testing revealed mild to moderately severe peripheral polyneuropathy and mild carpal tunnel syndrome. R. at 44.

The ALJ also noted Plaintiff's May 30, 2008 consultative examination performed in connection with Plaintiff's claim for disability benefits. R. at 44. Plaintiff's pain was rated a 5/10 (moderate). R. at 44. She admitted that her pain was treated with only ibuprofen, Tylenol, and Flexeril. R. at 44. Plaintiff exhibited a full range of motion in her neck and back, a muscle strength of 5/5, and a grip strength of 4/5. R. at 44. Her hands were assessed as normal. R. at 44. The ALJ

then pointed to Plaintiff's October 24, 2008 consultative examination. R. at 44. At that examination, Plaintiff complained of hand pain but stated that she drives, cooks, cares for her personal needs, and does laundry. R. at 44. Her shoulders had a normal range of motion, her grip strength was equal, and her muscle strength was 5/5. She had good muscle strength and a normal range of motion in her hands, hips, knees, and ankles. R. at 44.

Based on the objective medical evidence, the ALJ found that Plaintiff had conditions capable of producing some pain and limitations, but that substantial evidence failed to corroborate the degree of restrictions and limitations that Plaintiff alleged. R. at 44. The ALJ further noted Plaintiff's inconsistent history of seeking treatment for pain that she otherwise alleged was chronic and severe, that Plaintiff admitted that she could be treated with over-the-counter pain medication, and the fact that Plaintiff had never been referred to a pain specialist. R. at 44. The ALJ emphasized Plaintiff's medical testing, which has been essentially normal or with mild abnormalities, and Plaintiff's normal grip strength and motor and sensory functioning. R. at 45. Further, the ALJ found that Plaintiff's allegations of the severity of her symptoms was not supported by her daily activities. R. at 46. The ALJ concluded that while Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, Plaintiff was not credible in describing the intensity, persistence, and limiting effects of her symptoms. R. at 46.

Plaintiff argues on summary judgment that the ALJ did not adequately discuss nonexertional limitations related to her knees, shoulders, and hands. *See* doc. 15-1, Br. at 13. She maintains that the ALJ did not go far enough in describing Plaintiff's abilities to reach, handle, finger, feel, bend, stoop, or perform other postural and manipulative activities. *Id.* The Court acknowledges that the ALJ did not explicitly mention these specific activities in its RFC analysis. However, the ALJ was not

required to discuss each and every movement that Plaintiff was or was not able to do, especially given that the ALJ considered all of the objective medical evidence and found Plaintiff to be not credible. *Falco*, 27 F.3d at 163-64.

Further, the Court concludes that substantial evidence supported the ALJ's determination that Plaintiff had the RFC to perform a full range of light work. Among other evidence, the ALJ's findings were especially supported by Plaintiff's own admissions as to her daily activities. In her May 2008 Daily Activity Questionnaire, Plaintiff explained that she "just ride[s] . . . out" her pain and that she exercises (walking and leg lifts), washes clothes, vacuums, makes the bed, baby sits her granddaughter, and cooks. R. at 188-90. In her September 2008 Function Report, she explained that she takes care of her personal hygiene, cooks, loads the dishwasher, does the laundry, picks up her grandchildren from school, takes her grandson to football practice, takes her granddaughter to dance class, shops for groceries, goes to church, and walks. R. at 218-22. In an October 2008 medical examination, Plaintiff stated that she drives, cooks, does the laundry, and takes care of her personal hygiene. R. at 474. In her September 2009 hearing testimony, Plaintiff admitted that she does the laundry, straightens up her room, gets the mail, and goes to church. R. at 79-80. Plaintiff also explained that she worked for some time despite her symptoms. Despite Plaintiff's argument to the contrary, "[i]t is appropriate for the Court to consider the claimant's daily activities when deciding the claimant's disability status." *Leggett*, 67 F.3d at 565 & n.12 (finding that a claimant's admissions that he was able to care for his children, perform household chores, cut the grass in small increments, and walk up to six blocks undermined his claim of disability (citing *Reyes v. Sullivan*, 915 F.2d 151, 155 (5th Cir.1990) (per curiam))).

In disputing the ALJ's analysis of the evidence, Plaintiff points the Court to her administrative hearing testimony, which provided more limited daily activities and abilities. Despite Plaintiff's testimony, substantial evidence, including Plaintiff's own admissions and allegations in her responses to physicians and her disability paperwork as well as the objective medical evidence, supports the ALJ's finding that Plaintiff is able to perform light work. Plaintiff has simply not shown that the ALJ's consideration of Plaintiff's daily activities and the objective medical evidence was improper or that its determination that Plaintiff could perform a light range of work was not supported by substantial evidence.

Finally, although not an issue raised by Plaintiff, the Court determines that the ALJ was not in error in rejecting Dr. McShan's opinion that Plaintiff was unable to work. Dr. McShan's statements as to the number of times he saw Plaintiff was flatly contradicted by the evidence, his notes included few objective medical findings, and his assertions about Plaintiff's needs made no sense when reviewed together in context. R. at 45-46.

## IV.

## CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment (doc. 15) is **DENIED**, Defendant's Motion for Summary Judgment (doc. 16) is **GRANTED**, and the Commissioner's decision is **AFFIRMED**.


SO ORDERED.

SIGNED: July 26, 2013.

JANE J. BOYLE
UNITED STATES DISTRICT JUDGE